WANDA COWAN, appellee, v. RAY COWAN, appellant.

No. 48912.

(Reported in 75 N.W.2d 920)

APRIL 4, 1956.

Kindig & Beebe, of Sioux City, for appellant.

Whicher & Davis, of Sioux City, for appellee.

THOMPSON, J.—On May 12, 1954, the parties hereto had been wife and husband for approximately twenty years. There had been pending at that time for about five months a separate-maintenance action instituted by the plaintiff. Both parties were communicants of the Roman Catholic Church. Their marital difficulties, according to the testimony of the plaintiff, were caused by the misconduct of the defendant with one Thelma Julius. Plaintiff says Thelma Julius admitted having "relations" with the defendant, this admission being made in defendant's presence. Although he took the witness stand, defendant made no denial of this evidence.

On or about the date above set forth, the parties to the pending separate-maintenance action entered into a stipulation settling their property rights, plaintiff amended the prayer of her petition to ask a divorce, and offered evidence upon which a decree was granted to her. The stipulation above referred to was apparently incorporated in the divorce decree. The parties were farm people, and the property involved was substantial, as was the share awarded to the plaintiff.

. . On the same date—May 12, 1954—the parties entered into another contract, in the nature of a supplement to the formal stipulation above referred to. It was not filed in the court records or made a part of the divorce decree. It is denominated a "Col-

lateral Agreement," and by its terms is a "collateral agreement and stipulation to the stipulation to be filed in the matter." The litigation here arises from Paragraph 3 of this second or supplemental agreement, which we set out:

"3. If either party hereto shall remarry prior to the time the youngest child of the parties, Charles Cowan, attains the age of twenty-one years, or prior to his sooner emancipation, such party shall forfeit and be indebted to the other in the sum of $10,000, and judgment may enter accordingly."

The parties had three sons, of whom Charles, the youngest, was 13 years of age at the time of the agreement. The defendant remained on his farm and the sons have at all times lived there with him, except that the oldest has now married and maintains his own home. On December 15, 1954, the defendant married Thelma Julius. The plaintiff thereupon made application to modify the divorce decree by incorporating therein the "collateral agreement." Defendant resisted, a hearing was had with evidence taken, and the trial court modified the decree as prayed and entered judgment for plaintiff for $10,000, with interest and costs.

Appellant states two propositions relied upon for reversal, which we shall consider in order. They are 1, that "The court erred in failing to find that Paragraph 3 of the 'Collateral Agreement' is contrary to public policy and, therefore, void or unenforceable"; and 2, "The court erred in failing to find that Paragraph 3 of the Collateral Agreement was unenforceable because it amounted to a penalty or forfeiture."

I. There is no doubt that Iowa follows the universal rule that contracts in general restraint of marriage are against public policy and so are void. McCoy v. Flynn, 169 Iowa 622, 625, 151 N.W. 465, 466, L. R. A. 1915D 1064. But there are exceptions, occasioned by varying factual situations; or perhaps it is more nearly correct to say there are facts to which the rule does not apply. Thus, it is often said, in fact it is well established, that restraints against second marriages are not invalid. We said in McCoy v. Flynn, supra, page 632 of 169 Iowa, page 468 of 151 N.W.: "That contracts in restraint of a second marriage are valid, is everywhere affirmed." And see Lewis v. John-

son, 212 Mo. App. 19, 251 S.W. 136, 138; Appleby v. Appleby, 100 Minn. 408, 111 N.W. 305, 10 L. R. A., N.S., 590, 117 Am. St. Rep. 709, 10 Ann. Cas. 563; Stauffer v. Kessler, 81 Ind. App. 436, 130 N.E. 651; and 17 C. J. S., Contracts, section 233, page 615.

If the contract under examination here was in restraint of marriage, it was clearly of a second marriage. But the appellant says that, even with second marriages, the restraint must serve some purpose other than merely that of preventing the marriage. Many of the cases concern wills, in which the testator limits a gift to his spouse so long as she does not remarry. It is universally held a reasonable limitation, the manifest intent being to support her until she has acquired another provider. In the case at bar the appellant thinks the restriction is a restraint only and has no other apparent or actual object.

Without holding that all restraints upon second marriage are valid—that is, that under no circumstances may they offend against public policy—we hold that no such invalidity appears here. We think the true rule is stated in 17 C. J. S., Contracts, section 233, supra, at page 615, in this language:

"It has been held that the term 'general restraint' means a restraint which binds a competent person not to marry anyone at any time, and that the validity of a contract, where the restraint imposed is only against marrying a particular person, or a person of a particular class, or within a specified limited time, should be determined with reference to its reasonableness under the circumstances."

The problem before us, in the light of the rule last quoted, is one of facts and the reasonable conclusions to be drawn from them. Some reference to authorities from other jurisdictions may be helpful. In Barnes v. Hobson, Tex. Civ. App., 250 S.W. 238, 242, 243, the governing principle is thus stated:

"We are inclined to think, in the light of all the authorities, and having in mind the basis of the rule, to wit, the interest the public has in the matter, that the term 'general restraint' as used in the rule should be construed to mean restraint which binds a competent person not to marry anyone at any time, and that the validity of a contract, where the restraint it imposes

is only against marrying a particular person, or a person of a particular class, or within a specified limited time, should be determined with reference to the reasonableness of such restraint under the circumstances of the particular case."

In this case an uncle contracted to will his 17-year-old niece $5000 in property if she would "not marry and be a good girl" until she became 22 years of age. Although here the restraint was against a first marriage, it was held to be reasonable, since the time of prohibition was limited. The contract was upheld.

Nunn v. Justice, 278 Ky. 811, 814, 129 S.W.2d 564, 566, concerned a factual situation in which a well-to-do father and mother deeded substantially all their property to their two daughters, each deed containing this provision: " 'First party shall hold and control any or all property mentioned in this deed as long as they live, so long as neither marries again. If either member of the first party marries again that member shall lose all control of the property.' "

The mother having died and the father remarried, the Kentucky Court of Appeals held that the deeds amounted to a contract, that the provision terminating the father's interest upon remarriage was valid, and the daughters were entitled to the full interest in and control of the property.

In Perreault v. Hall, 94 N.H. 191, 192, 49 A.2d 812, an employee had contracted to remain with her employer as business assistant and adviser, and "give her full attention to said [the] business by not becoming married." This restraint was held to be reasonable and the contract valid.

6 Williston, Contracts (Rev. Ed.), section 1741, at page 4926, states the rule in these terms: "The modern law regards bargains and conditions in restraint of marriage as only prima facie illegal and will accord them validity if the restraint is shown to be reasonable under the circumstances. For example, reasonable contracts involving the performance of services which are inconsistent with matrimony have been upheld."

Pomeroy on Equity Jurisprudence, 4th Edition, volume 2, section 933, says: "It seems to be settled by an overwhelming weight of authority that limitation and conditions, precedent or subsequent, tending to restrain the second marriage of women

are valid, and by the most recent decisions the same rule has been applied to the second marriage of men."

A clear statement of the rule is this from Page on Contracts, volume 2, section 930: "A contract whereby a competent person who has once been married, agrees not to marry again or a contract whereby such person will be subjected to loss in case he does marry again, is not invalid as being in restraint of marriage."

We conclude that not all restraints, even on first marriages, are of necessity invalid. They will be upheld if they are not general and unlimited and if they serve a reasonable purpose. The tendency is also to uphold restraints on second marriages, either because it is said the "public policy" rule does not apply to such marriages, or on the more limited ground, found in the facts of the cases, that the restraints imposed are under the circumstances reasonable and intended to serve a proper and meritorious purpose. We think the facts in the instant case bring it within the latter rule.

It is suggested by the defendant that the different legal viewpoints concerning first marriages and second marriages arose in England when the canon law, which frowned upon remarriages, was important. Now, in the United States, say defendant's counsel, all marriages are on an equal footing under the law, and the canon law has no application.

The reason for the rule that general and unlimited restraints on marriage offend against public policy lies in the universal belief that marriage is the proper way of life, and must be encouraged. But there are clearly some marriages not made in Heaven, which a just and informed public opinion must condemn rather than approve. Such a marriage is that between a divorced husband and the woman with whom his misconduct left his blameless wife no alternative but to resort to the divorce courts.

A remarriage under these circumstances is strongly disapproved by the defendant's church. The plaintiff testified that under these circumstances "the individual that remarries is eliminated or ousted, in plain speaking, from the Catholic Church."

█ It is evident that, far from basking in the warmth of public sanction, a marriage such as the defendant contracted here meets with general disapproval and the strongest condemnation from the church of his choice. The reason for the rule making general restraints on marriage void and unenforceable fails here, and where the reason for a rule no longer exists, the rule should not be applied. This is but another way of saying that restraints which are reasonable under the existing circumstances and conditions are valid and will be enforced.

We have pointed out that the defendant, as a witness upon the hearing, did not deny his improper conduct with the woman, Thelma Julius. The plaintiff testified, without objection, that she wished Paragraph 3 to be included in the agreement in the hope the defendant would not marry the Julius woman so long as her sons were living in his home. She feared the effect of a woman of such evident loose morals upon them. It will be noted the restriction upon marriage is not general—that is, unlimited as to time, but only for a period of seven or eight years, at the most, until the youngest son becomes of age or is sooner emancipated. In view of the undenied misconduct of the defendant and Thelma Julius, the purpose seems laudable and the restraint reasonable. The defendant had been once married; he voluntarily signed a contract subjecting himself to loss if he chose to remarry; the restraint imposed was not general, but limited in time, and its object was a proper and reasonable one. The defendant received the benefit of the signing of the stipulation-in-chief and the supplemental or "collateral" agreement, and so of the adjustment of property rights in the pending litigation. He made his contract, and we think it was a valid one.

█ II. The defendant's second proposition relied upon is likewise without merit. It matters little whether Paragraph 3 provides for a forfeiture, as defendant urges, or for liquidated damage as plaintiff contends. It is true forfeitures are not favored in the law, but they are not outlaws. In Fairgrave v. Illinois Bankers Life Association, 211 Iowa 329, 334, 233 N.W. 714, 716, we said: "If the parties have, by the terms of their agreement, fixed the consequences of a forfeiture on the violation of it, this becomes the law of their contract, and by it they are to be governed."

We do not hold that the language used implies a forfeiture; but it would not avail defendant if we did. He made what we have held in Division I was a valid contract, of which he has received and retains the advantages. If he contracted for a forfeiture, while the law will scan it closely and will look upon it with disfavor, yet it is part of his contract and we perceive no reason why it should not be enforced.

The same general rule is thus stated in 12 Am. Jur., Contracts, section 435: "The law permits a man to make a contract which will result in a forfeiture; and when it is clear from the terms of the contract that the parties have so agreed, a court of law, as well as a court of equity, will enforce the forfeiture."

To the same effect is this language from 17 C. J. S., Contracts, section 407, page 896: "In the absence of a statute declaring such provisions to be void, however, a clear stipulation for a forfeiture will be enforced where not contrary to public policy, and the law does not, unless there is a foundation in fact or law to justify it, prevent a forfeiture."

We find no error.—Affirmed.

All JUSTICES concur.